JACQUELINE KAISER, Plaintiff-Appellant, *v.* JOHN FULTON DIXON *et al.*, Defendants-Appellees.

Second District   No. 2—83—0671

Opinion filed September 7, 1984.

Bruce Plattenberger, of Kaplan & Kaplan, of Chicago, and G. Lee Coleman, of Naperville, for appellant.

Craig O. Larson and Richard C. Baker, both of Bloomingdale, for appellees.

JUSTICE REINHARD delivered the opinion of the court:

Plaintiff, Jacqueline Kaiser, appeals from a June 21, 1983, judgment entered by the trial court, which confirmed the decision of a village of Roselle (Roselle) hearing officer denying plaintiff reinstatement as a dispatcher for the Roselle police department, back pay, and attorney fees. Plaintiff also appeals from a February 6, 1980, trial

court order, which issued a writ of *mandamus* compelling Roselle to hold a hearing on the question of plaintiff's discharge, but denied her request to be reinstated with back pay without a hearing. Plaintiff's prior appeal from the 1980 order was dismissed by this court for lack of jurisdiction because the order was not final. (*Kaiser v. Village of Roselle* (1980), 88 Ill. App. 3d 1199 (Rule 23 order).) Defendants, John Dixon, the director of village services and personnel, James Munroe, the chief of police, and Roselle cross-appeal from the February 6, 1980, order.

Plaintiff raises the following issues on appeal: (1) whether plaintiff was improperly discharged by the chief of police; (2) whether plaintiff was discharged in a manner contrary to the ordinances and staff policy manual of Roselle; (3) whether plaintiff was terminated in a manner contrary to the rules and regulations of the Roselle police department; and (4) whether the later, court-ordered hearing afforded plaintiff by Roselle denied her due process.

On November 11, 1977, plaintiff's employment as a radio dispatcher for the Roselle police department was terminated. She brought suit seeking, in count I of her second amended complaint, a writ of *mandamus* ordering defendants Dixon and Roselle to hold a hearing "regarding the termination of plaintiff's employment" and ordering her reinstatement with back pay pending the hearing. She also sought attorney fees in count I. Count I alleged plaintiff was improperly terminated because the defendants failed to follow the procedures set out for terminating a village employee in Roselle's staff policy manual (manual). Count II, in the alternative, alleged that plaintiff was improperly terminated by the chief of police because her termination was effected under rules and regulations of the police department which were void to the extent they attempted to vest authority in the chief of police to hire or fire employees of the police department who were not sworn police officers. Count II sought reinstatement and back pay. Count III, in the alternative, alleged plaintiff was a member of the police department and that she was not terminated in accordance with the police department rules. Count III sought a writ of *mandamus* ordering the defendants to vacate plaintiff's termination and reinstate her "as a member of the Roselle Police Department with full back pay, plus interest, costs, and attorney's fees."

At trial, plaintiff called Joseph Devlin, the president of Roselle's board of trustees, as an adverse witness. He testified that defendant Munroe, the chief of police, contacted him about the chief's intention to fire plaintiff. Devlin did not fire plaintiff but "had concurred with the action." He did not contact plaintiff, investigate the charges

against her, give her a list of charges, seek documentation of the charges, hold a hearing concerning the termination, or inform her of a right to a hearing.

John Dixon, the former director of village services and personnel, was called by plaintiff as an adverse witness. He testified that, while he was the director, he suspended plaintiff in January 1977. At the time of this suspension, Munroe recommended that plaintiff be dismissed. After discussing the matter with the chief and plaintiff, Dixon decided to suspend plaintiff rather than terminate her. Dixon wrote the letter notifying plaintiff of her suspension.

Dixon testified that he did not recall being asked to take any disciplinary action against plaintiff at a later time and did not recall receiving plaintiff's exhibit No. 5I which was a November 11, 1977, document from the chief requesting that plaintiff be terminated. He was out of town on that date and, on his return, plaintiff was "no longer an employee." He was not sure whether the village president or the chief fired plaintiff. He testified that he did write a letter (plaintiff's exhibit No. 5F) denying plaintiff's request for a hearing before him and that plaintiff did not request a hearing within the proper time frame. No specified time period for seeking a hearing is provided in the manual, so he believed the time would be a reasonable time.

Defendant James Munroe, the police chief, testified as an adverse witness that he hired plaintiff subject to the approval of Dixon as to salary. He indicated that Dixon could have prohibited his hiring someone but that "it was not done." In January 1977, he sought to terminate plaintiff, but Dixon thought a suspension would be more proper. In his January 5, 1977, memo to Dixon (plaintiff's exhibit No. 5), he recommended that plaintiff be terminated. He testified that he "poorly worded this document" and "should have perhaps said that on consultation with [Dixon], I had decided to back off and have the suspension."

On November 11, 1977, the chief talked with Devlin and told him he intended to fire plaintiff unless Devlin had an objection. Devlin concurred in the termination. The chief testified he did not know why he had plaintiff's exhibit No. 5I, which requests Dixon to terminate plaintiff, prepared in November 1977.

When plaintiff arrived for work on November 11, 1977, he told her he intended to fire her. He did not give her a written list of charges, hold a hearing or give her an opportunity to answer the charges. He admitted he did not exactly follow the police department rules in terminating plaintiff. He believed the rules gave him "power to amend or modify them" at his discretion and that he could override

them "even on moment's notice for the public safety and public good
***." He believed he did not have to follow the police department
rules.

Plaintiff testified on her own behalf that she was a radio dis-
patcher with the Roselle police department beginning September 1,
1976. Her annual salary was $9,132 when she left on November 11,
1977. She also had obtained $2,274 in benefits and $798 in overtime
pay.

She received a three-day suspension on January 7, 1977. She iden-
tified plaintiff's exhibit 5C as a letter she received from the chief
granting her request for a hearing after the suspension. It contains a
written list of charges. She later withdrew her request for a hearing.
She was terminated on November 11, 1977.

Defendants called plaintiff as an adverse witness. She testified
that the chief's secretary was her immediate supervisor. She did not
know of anyone outside the police department who was in her chain
of command. She testified she appealed her termination to Dixon.

Chief James Munroe testified that he wrote the rules of the police
department and that these rules were adopted by the board of trust-
ees.

In a written order issued on February 6, 1980, the trial court or-
dered Roselle and Dixon's successor as director of village services and
personnel (now called village administrator), Glenn Spachman, to hold
a hearing in accordance with the manual to determine whether plain-
tiff should be reinstated. The court ordered that plaintiff "shall not
recover any back pay *** unless she is reinstated pursuant to the
hearing ***."

The trial court set forth several findings in this order. Among
these were a finding that the manual became a part of plaintiff's em-
ployment contract when she was hired by Roselle; that the rules and
regulations of the police department reflect the rights in the manual
rather than contradicting them; that plaintiff was not a "member" of
the police department as that term is used in the Code of Ordinances
of Roselle; that under the manual plaintiff was entitled to a hearing
prior to her dismissal; and that she had made a timely request for a
hearing.

On February 14 and 21, 1980, the hearing ordered by the trial
court was held before Glenn Spachman, the village administrator of
Roselle. At this hearing, the parties elicited testimony concerning the
opinions of the various Roselle officials on whether they believed
plaintiff was entitled to a hearing, and under what circumstances she
would be entitled to a hearing. However, since the trial court had al-

ready determined that plaintiff was entitled to the hearing, this testimony is irrelevant and will not be recounted.

Defendant Munroe, the police chief, testified at the hearing. During the course of his testimony, several exhibits were offered by the village. These exhibits, which were various reports and memoranda by subordinates of the chief concerning plaintiff's misconduct, were objected to by plaintiff on the basis of relevance and hearsay. These exhibits were accepted into evidence.

Exhibit A was an October 11, 1977, memo from Hope Vandalia, plaintiff's supervisor, to the chief in which Vandalia reports that on October 10, 1977, plaintiff told another dispatcher that they should each take the radio room alone for four hours rather than both being there together for a full eight hours. It also indicated plaintiff was making arrest packages, which was outside the scope of her duties. Exhibit B was an October 11, 1977, memo from Vandalia to the chief concerning plaintiff's ongoing practice of calling Linda Crowley or Grace Jacobs, rather than the records clerk on duty, to get answers to her questions. It also indicated Linda, her son, and a friend named Mary were spending a lot of evenings at the police department and were "taking over the entire department." Linda Crowley and Grace Jacobs were former employees of the police department.

Exhibit C was an October 27, 1977, memo from Carol Kaad, a police department clerk, to Vandalia concerning plaintiff. It lists numerous derogatory statements about the department or department employees Kaad heard plaintiff make. It also states plaintiff has had visitors in the radio room for "great lengths of time," permitted them to use the copy machine and telephones, and gave them "departmental information which is derogatory to this department and various personnel."

Exhibit D was a November 11, 1977, memo from Stacy McGahey, a dispatcher, to the chief. It states that on November 10, 1977, plaintiff left her post and went to the "Juvenile office" for approximately 10 minutes, to talk with Officer Wiesman, and that she soon thereafter received a personal call, during which she outlined the department's structure and gave "information on the functioning of the department, which should be considered confidential." Plaintiff then called Linda and talked about other internal department matters, including charges brought against a sergeant. Plaintiff had discussed these matters over the telephone, on a prior day, with Grace Jacobs. Other exhibits were also received, which contain similar information.

The chief testified that he took someone else's word for the truth of every matter involved here and did not have personal knowledge.

Stacy McGahey, a former dispatcher with the village, testified for the village. She worked with plaintiff for three months. She went through each statement in Exhibit D and confirmed they were true and that she had prepared it. On cross-examination, she testified she did not recall what plaintiff told Linda Crowley or Grace Jacobs about the charges against the sergeant and could not relate the gist of the conversation. She said she did not know if Officer Wiesman was in charge of the shift when plaintiff went to the juvenile office to talk with him. If he was, it may have been appropriate for plaintiff to go back and talk with him at his direction. McGahey testified that the only marked difference between plaintiff's behavior and the behavior of others was the frequency of her telephone usage for personal matters.

Plaintiff called Linda Crowley. She testified she was on maternity leave from the department from April 28, 1977, to April 28, 1978. Crowley stated she had discussed proposed disciplinary proceedings against the sergeant with plaintiff; that though she was on a leave of absence she still considered herself a department employee at the time of this conversation; that she came to the station often to see friends, not only plaintiff, while on leave of absence, and was never told not to go there; and that she once had a friend drop her off at the station to meet plaintiff, that they were only there a couple minutes and that plaintiff was off duty at the time. On cross-examination she testified that during 1977 she did talk with plaintiff, while plaintiff was on duty, more than once a week and that they discussed the department in general, the chief, officers and dispatchers.

Grace Jacobs testified for plaintiff that she was a village employee from August 1974 through March 1976, and that after leaving this employment she never talked with plaintiff while plaintiff was on duty.

On March 3, 1980, the hearing officer and new village administrator, Glenn Spachman, entered a decision denying plaintiff reinstatement. He found, *inter alia*, that plaintiff had violated provisions of the staff policy manual and rules and regulations of the police department; that plaintiff was discharged for cause; and that Roselle produced sufficient evidence justifying plaintiff's discharge.

On December 17, 1981, plaintiff filed an amended petition for reinstatement requesting a review of the administrative proceedings and alleging a denial of due process under 42 U.S.C. sec. 1983 (1976). The petition also requested attorney fees pursuant to 42 U.S.C. sec. 1988 (1976).

On June 21, 1983, the trial court entered judgment confirming the

findings and decision of the hearing officer. The court found, *inter alia*, that the hearing officer's findings were supported by the evidence and not contrary to the manifest weight of the evidence and that defendants submitted sufficient evidence at the hearing to substantiate the charges against plaintiff. The court denied plaintiff's request for costs and attorney fees, denied plaintiff's request for reinstatement and back pay "at least from November 11, 1977 until the date of the hearing officer's decision," and denied plaintiff's request for relief under sections 1983 and 1988 of the Civil Rights Act (42 U.S.C. secs. 1983, 1988 (1976)). Plaintiff appeals from this judgment and from the order of February 6, 1980. Defendants cross-appeal from the February 6, 1980, order arguing that plaintiff was properly terminated in November 1977 and was not entitled to the hearing ordered by the trial court.

The first issue we address is whether plaintiff was improperly discharged by the chief of police. Plaintiff contends that her discharge on November 11, 1977, was void because she was fired by the police chief, who lacked authority to terminate her. Plaintiff maintains that, under the ordinances of Roselle, only the director of village services and personnel (director) had the authority to discharge village employees. She claims that since she was not a sworn member of the police department, only the director could discharge her and that he did not. Therefore, she concludes that her discharge is void and that she must be reinstated with back pay.

Defendants contend that the police chief was empowered by section 300.99 of the rules and regulations of the police department to discharge plaintiff; that Devlin, the village president, concurred in her discharge while serving as acting director of village services and personnel; and that Dixon, the director, ratified the termination on his return from vacation. Defendants, therefore, maintain that even if the chief lacked authority to discharge plaintiff, she was properly terminated by the actions of Devlin and Dixon.

Section 10—4—1 of the Illinois Municipal Code (Ill. Rev. Stat. 1983, ch. 24, par. 10—4—1) provides that the "corporate authorities of any municipality may provide by ordinance in regard to the relation between all municipal officers and employees in respect to each other, the municipality and the people." The Code of Ordinances of the Village of Roselle created in the village the position of director of village services and personnel. (Roselle, Ill., Ordinance 2—208 (1978).) The duties of this position included the supervision of "all appointed officers of the village and all village employees." (Roselle, Ill., Ordinance 2—213(d)(1978).) The village code gave the director the authority to

hire, suspend or discharge all employees of the village, except the police chief and fire chief, and the "members of the police or fire departments" for whom the director must make recommendations to the board of fire and police commissioners for action concerning these employees. (Roselle, Ill., Ordinance 2—213(e)(1978).) In the event of the temporary absence of the director of village services, the president of the village is required to act as the director. Roselle, Ill., Ordinance 2—209 (1978).

A board of fire and police commissioners was created by ordinance (Roselle, Ill., Ordinance 2—179 (1978)), and authorized to "appoint all officers and members of the fire and police departments ***" (Roselle, Ill., Ordinance 2—183) and to remove such members (Roselle, Ill., Ordinance 2—184). The village ordinances also provide that the chief of police may "make or prescribe such rules and regulations for the guidance of the members of the department as he shall see fit. Such rules, when approved by the president and board of trustees, shall be binding on all members." Roselle, Ill., Ordinance 16—7 (1978).

■ It is clear from these ordinances that the power given the chief to make rules and regulations, which would be binding on the members of the police department, does not include the power to discharge members. If section 16—7 were construed to give this power, it would render meaningless the power given the fire and police commissioners in sections 2—183 and 2—184, and the court should not assume that a legislative body engaged in a meaningless act. (*Maiter v. Chicago Board of Education* (1980), 82 Ill. 2d 373, 388-89, 415 N.E.2d 1034.) Thus, even if we were to consider plaintiff to be a member of the police department, the chief lacked authority to discharge her. However, it is also clear from the ordinances that plaintiff was not a member of the police department. She was not appointed to her position by the board of fire and police commissioners. She was hired after interviews with the police chief and the director. Additionally, other references to "members" in the ordinances indicate that the term "member" refers only to sworn members of the police department. (*E.g.*, a member's duty is to enforce ordinances and keep the peace (Roselle, Ill., Ordinance 16—2(1978)). Since the ordinance granting the chief rulemaking authority only allowed him to make rules binding on the members of the police department, the chief could not make a rule allowing him to discharge a nonsworn employee. Such a rule would be invalid because it purports to extend the scope of his authority beyond that given him by the enabling legislation. (*Homefinders, Inc. v. City of Evanston* (1976), 65 Ill. 2d 115, 129, 357

N.E.2d 785.) Further, an interpretation of section 16—7, which would give the chief authority to make rules allowing him to terminate non-sworn employees, would be inconsistent with section 2—213, which places the authority for discharge in the director. The plain meaning of the ordinances places the authority to discharge in the director. (See *Schutzenhofer v. Granite City Steel Co.* (1982), 93 Ill. 2d 208, 211-12, 443 N.E.2d 563.) Any inconsistent interpretation of another section of the same code of ordinances should be avoided. (See *Mann v. Board of Education* (1950), 406 Ill. 224, 230, 92 N.E.2d 743.) Therefore, under the ordinances at hand, section 300.99 of the rules and regulations of the police department promulgated by the chief of police is invalid to the extent it provides that the chief may discharge a civilian employee.

While the chief lacked authority to discharge plaintiff, the record shows that the hearing officer found that plaintiff was discharged with the concurrence of the village president, who at the time was the acting director of village services and personnel. The trial court confirmed these findings.

■ The trial court's affirmance of the findings of the hearing officer indicates an acceptance of the finding that plaintiff was discharged with the concurrence of the president of the village, while the president was acting as director, under section 2—209 of the village code of ordinances. Plaintiff does not cite any authority which indicates that any action beyond concurrence by the acting director would be necessary to establish that he, rather than the police chief, was the person who discharged plaintiff. While the testimony of all the village officials demonstrated a certain amount of confusion as to who had authority to terminate plaintiff, the factual finding of the hearing officer, which was confirmed by the trial court, is not manifestly erroneous, and thus, will not be disturbed. (*Carrigan v. Board of Fire & Police Commissioners* (1984), 121 Ill. App. 3d 303, 308, 459 N.E.2d 659; see also *Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (1981), 85 Ill. 2d 547, 550, 426 N.E.2d 885.) Thus, we conclude that plaintiff was not discharged by an official lacking authority to do so.

Since we conclude that the police department rules and regulations are invalid to the extent they purport to give the police chief power to discharge nonsworn employees, we need not address plaintiff's claims that the discharge procedures provided in the rules and regulations were not followed or, alternatively, were void for other reasons.

The next question we address is whether plaintiff's discharge was

subject to the staff policy manual.

The parties agree that the staff policy manual was adopted by resolution of the village board on January 24, 1977, subsequent to plaintiff's hiring by Roselle. Plaintiff maintains this manual became a part of her contract of employment and created a constitutionally protected property right in her employment. She contends that the failure of defendants to follow the procedures for discharge set out in this manual constituted a breach of contract and a denial of due process.

Besides arguing that the police department rules and regulations, rather than the staff policy manual, apply, defendants maintain that the manual, even if it did apply, did not create a protectable property interest; that the manual's procedures for discharge were complied with; and that due process was accorded plaintiff.

Plaintiff relies primarily on *Carter v. Kaskaskia Community Action Agency* (1974), 24 Ill. App. 3d 1056, 322 N.E.2d 574, as the basis for her claim that the staff policy manual was a part of her contract. In *Carter*, the plaintiffs were employees of a not-for-profit agency. No written contract existed, and no oral contract, as to tenure, existed. During the plaintiff's employment, the defendant's director compiled a policy manual, which included procedures for dismissal, which was accepted by the employees and approved by the agency board of directors. The court held that the manual became part of the employment contract since both parties agreed to it. The plaintiffs' agreement to this modification of their contract was found because "when the term of employment is at the will of the parties, continuing to work not only constitutes assent but also consideration for any modification of the original contract." *Carter v. Kaskaskia Community Action Agency* (1974), 24 Ill. App. 3d 1056, 1059, 322 N.E.2d 576.

However, in *Sargent v. Illinois Institute of Technology* (1979), 78 Ill. App. 3d 117, 397 N.E.2d 443, the court held that a policy manual of a private employer containing discharge procedures was not part of a contract, because of lack of consideration. Where the manual existed prior to the plaintiff's beginning employment, it was not bargained for, and the only obligation it imposed on plaintiff was the obligation to perform his job properly. The court distinguished *Carter*, as follows:

> "*Carter* is distinguishable from the instant case in several respects. There the manual was adopted subsequent to plaintiff's employment and was considered a modification of the original employment contract. The employer had compiled the manual

and reviewed it with the employees who accepted it. The court found that mutuality of obligation existed for the contract and that by continuing to work under the manual, the employees had furnished consideration. The board of directors had approved the manual and testimony of a former director of the corporation clearly showed that the manual was part of the contract.

Unlike *Carter*, the campus police guidelines set forth in the personnel manual were not bargained for and the manual was given to plaintiff when he began his employment. Viewed as a whole, the manual defines the duties and responsibilities of a campus policeman and serves as a code for his conduct. By agreeing to be bound by the guidelines, he has merely agreed to properly perform his required duties and nothing more. Plaintiff provided no additional consideration to support the predischarge hearing requirement and it did not become an enforceable contract. (*Zagar v. Field Enterprises Educational Corp.* (1978), 58 Ill. App. 3d 750, 752-53, 374 N.E.2d 897.) Since the personnel manual was not an enforceable contract, count I of his complaint was properly dismissed." 78 Ill. App. 3d 117, 121-22, 397 N.E.2d 443.

These cases appear to be the only Illinois cases that treat this matter. A Federal court, applying Illinois law, has followed *Sargent.* (*Rynar v. Ciba-Geigy Corp.* (N.D. Ill. 1983), 560 F. Supp. 619.) Other jurisdictions are split, with some holding that the terms of a policy manual, not bargained for by employees, are not binding on an employer (*e.g., Richardson v. Charles Cole Memorial Hospital* (Pa. Super. 1983), 466 A.2d 1084; *Heideck v. Kent General Hospital, Inc.* (Del. 1982), 446 A.2d 1095; *Johnson v. National Beef Packing Co.* (1976), 220 Kan. 52, 551 P.2d 779), while others hold that an employer is bound by the terms of a policy manual it unilaterally creates for its employees. (*E.g., Southwest Gas Corp. v. Ahmad* (Nev. 1983), 668 P.2d 261; *Pine River State Bank v. Mettille* (Minn. 1983), 333 N.W.2d 622; *Toussaint v. Blue Cross & Blue Shield* (1980), 408 Mich. 579, 292 N.W.2d 880; see generally Annot., 12 A.L.R. 4th 544 (1982).) We believe the better reasoned approach, to be applied to the facts present here, is that which binds the employer to the terms in its policy manual. We find particularly persuasive the view expressed by the Michigan Supreme Court, that once an employer has promulgated a policy "presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory." (*Toussaint v.*

*Blue Cross & Blue Shield* (1980), 408 Mich. 579, 619, 292 N.W. 2d 880, 895; see also *Damrow v. Thumb Cooperative Terminal, Inc.* (1983), 126 Mich. App. 354, 337 N.W.2d 338.) A policy manual of the type here cannot be allowed to create rights for employees, including the right not to be arbitrarily discharged after notice and hearing, which disintegrate when an employee attempts to exercise them.

■ The manual in the instant case consists of 83 pages. In the forward to the manual it is stated that the manual is "designed to serve both as a management tool as well as an educational and informational instrument." The forward also encourages employee comment and suggestions for the manual. The manual covers a wide range of matters including provisions for a probationary work period, employee evaluation, employee conduct, work habits and attitudes, holiday, sick leave, time off, and vacation policies, overtime, and discipline, grievance, and dismissal procedures. Under its provisions, therefore, there is a mutuality of obligation by both employer and employee. That the manual was adopted after plaintiff's employment and that there is no evidence that the manual was "bargained for" by the employees should not make the provisions still in effect at the time of her discharge unenforceable by the employee. Through adoption of the manual, Roselle obligated itself to follow the procedures for discharge in the manual. Not every utterance or general statement of policy by an employer will rise to a binding contractual obligation. Nevertheless, we conclude that the detailed manual adopted by Roselle here imposes obligations on both employee and employer which are enforceable under the facts here. This manual goes far beyond a mere expression of employer policies and procedures as guidance or for informational purposes for Roselle employees. To the extent that our reasoning is inconsistent with *Sargent*, we decline to follow that opinion.

We next must determine what rights plaintiff was accorded by the manual. Plaintiff contends her termination was void because she was not provided with written notice of the charges against her or a hearing, as required by the staff policy manual, prior to her termination. She maintains that because the manual was part of her contract, this failure rendered her termination void. She claims she was entitled to reinstatement rather than a hearing because of this contract breach.

The staff policy manual provides in Item 41 that "[n]o permanent employee shall be disciplined except for violation of established policies ***." It then sets out the grounds for discipline. Part IV of Item 41 provides that "[p]ermanent employees shall be dismissed only after having been given written notice." Part VI of Item 41 provides that

all "permanent employees are granted the right of appeal [from disciplinary actions]. The appeal process shall take the same format and time frames of the grievance procedures." Item 43 sets out the grievance procedure, which requires an employee to file a written grievance within five working days of the decision of his immediate supervisor with his department head and within five days of the department head's decision with the director of village services and personnel.

Item 42 provides that "[d]ismissals are made by the Director of Village Services and Personnel in accordance with the powers vested in him or as otherwise provided by State Statutes." It further provides that "[i]mmediate dismissal for incompetence, insubordination, or mental or physical disability and improper conduct may, however, be made for the good of the Village." It also provides that "[i]f dismissal is indicated, reasonable notice should be given if practicable. The employee concerned may request a hearing before the Director of Village Services and Personnel and may have such representation as he may choose."

A conflict appears to exist between Item 41, which requires written notice to permanent employees before discharge and Item 42, which provides that "reasonable notice should be given if practicable." Another apparent conflict is that Item 41 only grants permanent employees the right to appeal disciplinary action through the grievance procedures, while Item 42 allows an employee to request a hearing before the director. The parties do not discuss this apparent conflict in their briefs, nor do they offer any suggestions on the proper interrelationship of these provisions.

Conflicting provisions should be reconciled where possible (*Premier Electrical Construction Co. v. Ragnar Benson, Inc.* (1982), 111 Ill. App. 3d 855, 862, 444 N.E.2d 726; *Roosevelt University v. Mayfair Construction Co.* (1975), 28 Ill. App. 3d 1045, 1059, 331 N.E.2d 835), and the manual should be read as a whole and construed to give meaning to all parts and a court should avoid a construction which renders some provisions superfluous. *Lukasik v. Riddell, Inc.* (1983), 116 Ill. App. 3d 339, 347, 452 N.E.2d 55.

A distinction exists in the language of Item 41 and Item 42. This distinction is between "permanent employees" and "employees." For example, permanent employees "shall be dismissed only after having been given written notice," can only be suspended or removed for grounds specified in Item 41, and are granted the right to appeal any disciplinary action. Other references in Items 41 and 42 are to employees, rather than permanent employees.

■ In order to give meaning to all the terms (116 Ill. App. 3d 339, 347, 452 N.E.2d 55), and to reconcile the apparently conflicting terms (*Premier Electrical Construction Co. v. Ragnar Benson, Inc.* (1982), 111 Ill. App. 3d 855, 862, 444 N.E.2d 726), it appears logical to construe these provisions to give greater rights to permanent employees than to other employees. Such a reading would mean that written notice must be given permanent employees before they may be dismissed (Item 41, IV), while for other employees, all that is required is that "reasonable notice should be given if practicable." Continuing this reasoning, Item 42's granting to permanent employees of a right to appeal disciplinary action should probably be construed, when applied to dismissals, as granting a right beyond that accorded to other employees. Item 42 grants all employees the right to a hearing before the director when dismissal is to occur. Nonpermanent employees are limited to this hearing as their only recourse in the event of dismissal, because they are not accorded the right to appeal disciplinary actions. Permanent employees, on the other hand, do have a right to appeal their dismissal to the director, because they are accorded the right to appeal all disciplinary actions. Thus, a permanent employee under the manual has the right to a hearing as do other employees and also has a right to have his dismissal, as well as any other disciplinary action, appealed to the director. Thus, a permanent employee has two avenues to challenge his dismissal, while other employees have only one.

Plaintiff was a permanent employee. Under the manual she was entitled to written notice prior to dismissal. She was also entitled to a hearing, or to appeal her dismissal, to the director. Plaintiff did not choose to file an appeal but chose instead to seek a hearing.

It is evident from the record that plaintiff was not given written notice prior to her dismissal. She was orally notified, by the chief, that she had been dismissed. Despite the lack of written notice, plaintiff requested a hearing and this request was denied. Since the manual provides plaintiff with the right to written notice and a hearing, and since she was denied both of these, plaintiff was denied her rights under the manual when she was discharged in November 1977. However, the denial of plaintiff's rights to written notice and a hearing was remedied when she received a subsequent, court-ordered hearing, as will be discussed in more detail later in this opinion.

Plaintiff also maintains that the manual gave her a constitutionally protected property interest in her employment, which was unconstitutionally taken away without due process of law. Due process analysis requires a two-step analysis. First, it must be determined

whether plaintiff had a protectable property interest. If such an interest is found, then it must be determined whether sufficient procedural safeguards were afforded to plaintiff when this property interest was taken away. *Board of Regents v. Roth* (1972), 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701; see also *Leis v. Flynt* (1979), 439 U.S. 438, 58 L. Ed. 2d 717, 99 S. Ct. 698.

■ A claim of entitlement giving rise to due process protection may arise from statute or legal rule or through a mutually explicit understanding. (*Leis v. Flynt* (1979), 439 U.S. 438, 442, 58 L. Ed. 2d 717, 722, 99 S. Ct. 698, 701.) Here, the manual expressly provides that no permanent employee shall be disciplined except for violation of established policies. Such a provision establishes that employment will only be terminated for such violations and therefore creates an entitlement to hold that job until such violation occurs. Such a "legitimate claim of entitlement to continue employment" is a constitutionally protected property interest which cannot be taken away without due process. See *Powell v. Jones* (1973), 56 Ill. 2d 70, 77-78, 305 N.E.2d 166.

Since a property interest exists, the next step is to determine what procedural steps were required before plaintiff could be discharged. The requirements of due process are necessarily proportional to the weight of the employee's interest in continued employment balanced against the countervailing interests of society in effective and efficient governmental operation. (56 Ill. 2d 70, 78, 305 N.E.2d 166.) Due process is designed to minimize substantively unfair or mistaken deprivations of life, liberty, or property by enabling persons to contest the basis upon which the government proposes to deprive them of protected interests. (*Carey v. Piphus* (1978), 435 U.S. 247, 259-60, 55 L. Ed. 2d 252, 262, 98 S. Ct. 1042, 1050-51.) Generally, when the government seeks to deprive a person of a protected interest some form of prior hearing is required. (*Boddie v. Connecticut* (1971), 401 U.S. 371, 379, 28 L. Ed. 2d 113, 119, 91 S. Ct. 780, 786.) An individual with a protected interest in public employment, who is discharged, is generally entitled to a hearing at his request, where he can be informed of the grounds for his discharge and challenge their sufficiency. (*Perry v. Sindermann* (1972), 408 U.S. 593, 603, 33 L. Ed. 2d 570, 581, 92 S. Ct. 2694, 2700.) Plaintiff was initially denied such a hearing. However, the trial court did order a hearing and one was ultimately held.

Plaintiff maintains that she should have been reinstated with back pay, at least, until the hearing was held to determine if there was cause for her discharge. She contends that since she was initially dis-

charged without due process, the discharge was improper, and that she, therefore, is entitled to back pay and reinstatement up to a time when she is properly discharged.

However, the United States Supreme Court has held that where a protected interest is initially taken away without due process, but later through due process, it is determined that cause existed for the deprivation, an award of damages for the deprivation would be a windfall rather than compensation. (*Carey v. Piphus* (1978), 435 U.S. 247, 260, 55 L. Ed. 2d 252, 262-63, 98 S. Ct. 1042, 1050; see also *Wilson v. Taylor* (5th Cir. 1981), 658 F.2d 1021.) Thus, plaintiff would only be entitled to back pay and reinstatement if it were determined that there was no cause for her discharge. Therefore, the trial court did not err in ordering a hearing to determine if cause existed for the discharge. Similarly, plaintiff's claim that she should be reinstated with back pay because of a violation of the terms of the manual by not providing her written notice and a hearing should fail since her damages, if any, would flow from her discharge without cause rather than from a failure to follow procedures. Her entitlement was to be discharged only for cause after manual procedures were followed. Since the trial court ordered a hearing at which the issue of cause could be determined, the error in the initial denial of these procedures was cured. Plaintiff would only be entitled to reinstatement with back pay if she had been discharged without cause.

The final issue to be addressed is plaintiff's claim that the hearing provided on order of the trial court was constitutionally infirm as it was conducted in a manner which denied her due process. Thus, plaintiff contends the decision of the hearing officer was void.

The result of the hearing ordered by the trial court was a finding that plaintiff was discharged for cause. Plaintiff maintains this hearing was constitutionally infirm in that it denied her due process because the hearing officer was not impartial, the defendants' attorney sought to prove guilt rather than seek the facts, hearsay was admitted, and the hearing officer based his decision, in part, on evidence received after the hearing had concluded.

Plaintiff contends the hearing officer was not impartial because he was the village manager of Roselle and Roselle stood to lose a substantial sum of money if plaintiff were reinstated. However, plaintiff does not cite any evidence from the record that the hearing officer was biased. Without a showing to the contrary, government administrators are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances. (*Scott v. Department of Commerce &*

*Community Affairs* (1981), 84 Ill. 2d 42, 55, 416 N.E.2d 1082.) Where no facts demonstrating bias are shown, a due process violation is not shown. *Fender v. School District No. 25, Arlington Heights* (1976), 37 Ill. App. 3d 736, 744, 347 N.E.2d 270; see also *Grissom v. Board of Education* (1979), 75 Ill. 2d 314, 319-22, 388 N.E.2d 398.

Plaintiff also argues that defendants' counsel at the hearing devoted himself entirely to proving plaintiff's guilt contrary to the requirement of *Gigger v. Board of Fire & Police Commissioners* (1959), 23 Ill. App. 2d 433, 163 N.E.2d 541. However, plaintiff does not cite any action of counsel which she deems was inappropriate. Such a bare contention waives the issue for appeal. *Village of Roxana v. Costanzo* (1968), 41 Ill. 2d 423, 426, 243 N.E.2d 242.

■ Plaintiff maintains that inadmissible hearsay was admitted and considered by the hearing officer. While plaintiff cites authority to the effect that hearsay is inadmissible in an administrative hearing (*e.g., Spaulding v. Howlett* (1978), 59 Ill. App. 3d 249, 375 N.E.2d 437; *Fantozzi v. Board of Fire & Police Commissioners* (1962), 35 Ill. App. 2d 248, 182 N.E.2d 577, *aff'd* (1963), 27 Ill. 2d 357, 189 N.E.2d 275), she presents no argument as to how the admission of this hearsay caused the hearing to violate due process or constituted a violation of 42 U.S.C. sec. 1983. Since the denial of due process is the issue presented for review and not the improper admission of evidence as error, plaintiff has failed to present any argument or authority to support her claim that due process was denied by the admission of this evidence and has therefore waived this issue. (*Village of Roxana v. Costanzo* (1968), 41 Ill. 2d 423, 426, 243 N.E.2d 242; *Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 943, 453 N.E.2d 1133.) Similarly, plaintiff fails to present argument or authority to support her assertion that the hearing officer's investigation, subsequent to the hearing of her witness Linda Crowley's employment status, constituted a denial of due process. Thus, this argument is also waived. Nonetheless, the point is also without merit. From an examination of the record it is clear that the hearing officer determined Crowley's employment status from the testimony at the hearing and from his examination of a personnel file which plaintiff's attorney agreed should be reviewed by him. Thus, plaintiff has failed to present a basis on appeal to sustain her claim that the hearing afforded plaintiff denied her due process of law.

■ While plaintiff has also requested attorney fees, apparently pursuant to 42 U.S.C. sec. 1988 (1976), there having been found no violation of 42 U.S.C. sec. 1983 (1976) upon which attorney fees may be based, this contention is meritless. If attorney fees are sought be-

cause plaintiff was partially successful in having the trial court order a hearing after reviewing her original dismissal, attorney fees are not recoverable under Illinois law from an adversary in the absence of a statute or an agreement between the parties. (*Losurdo Brothers v. Arkin Distributing Co.* (1984), 125 Ill. App. 3d 267, 274-75, 465 N.E.2d 139.) Plaintiff has shown no authority for attorney fees.

For the foregoing reasons the February 6, 1980, order and the subsequent judgment of June 21, 1983, of the circuit court of Du Page County are affirmed.

Affirmed.

SEIDENFELD, P.J., and UNVERZAGT, J., concur.